IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Reff Properties, LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 14 C 50002 |
| vs. | ) |
| | ) |
| Bauer Group Agency, Ltd., et al., | ) |
| | ) Judge Philip G. Reinhard |
| Defendants. | ) |
| | ) |
| In Re: Pinewood Buffet & Grill, Inc. | ) |

## ORDER

For the reasons stated below, plaintiff's motion [66] for summary judgment is granted in part and denied in part. Plaintiff's motion is granted as to the sum of $41,431.58 from the proceeds of the "Contents Check". Otherwise, plaintiff's motion is denied. Reff's motion [70] for summary judgment is granted. Fishburn is ordered to deliver the sum of $41,431.58 from the proceeds of the "Contents Check" to plaintiff. Fishburn is directed to deliver the proceeds from the "Building Check" and $550.00 from the proceeds of the "Contents Check" to Reff Properties, LLC. It appears that this order moots Reff's third-party action against the Insurance Defendants and Smith. Reff shall file a motion to dismiss the third-party action or notify the court that it intends to proceed with that action – with an explanation as to why the action is not moot – on or before August 21, 2015.

## STATEMENT-OPINION

Plaintiff, Daniel M. Donahue, trustee of the bankruptcy estate of Pinewood Buffet & Grill, Inc. ("Pinewood"), brings this action for declaratory judgment against defendants, Jennifer Smith, Reff Properties, LLC ("Reff"), and Dan G. Fishburn[1]. Plaintiff seeks a declaration that certain funds held by Fishburn are the property of the bankruptcy estate (Count I) and further asks the court to order Fishburn to turnover these funds to the bankruptcy estate (Count II). The funds at issue are the proceeds of insurance paid as the result of a fire at a restaurant owned and operated by Pinewood in a building it leased from Reff. Smith, who is a lender to Pinewood, agrees with plaintiff that these proceeds belong to the bankruptcy estate. Reff denies plaintiff is entitled to a declaration that the funds belong to the bankruptcy estate. Reff also filed a counterclaim asserting the funds belong to it and, that to the extent the estate has an interest in these funds, that interest is subject to a constructive trust or equitable lien in favor of Reff. Plaintiff [66] and Reff [70] each move for summary judgment denying the other's claims and granting their own.

---

[1] Fishburn is named only in his capacity as the trustee under an attorneys trust account agreement which is holding the funds which are at issue in this case.

1

Also pending, is a third party claim by Reff against Bauer Group Agency, Ltd. ("Bauer"), Michael Woodward, Auto-Owners Insurance ("Auto-Owners") (collectively, "Insurance Defendants"), and Smith. This claim is not at issue in the summary judgment motions. However, Bauer and Woodward have filed a memorandum in support of Reff's summary judgment motion.

Todd and Amy Reid were the sole shareholders of Pinewood. Bauer was a disclosed agent of Auto-Owners authorized to issue insurance binders on Auto-Owners's behalf. Woodward was a licensed insurance producer in Illinois working for Bauer.

In August 2009, Reff purchased a building in Freeport, Illinois along with certain equipment paying $340,000. $225,000 of the purchase price was allocated to the building and $115,000 to the equipment. One year later, in August 2010, Pinewood entered a lease with Reff for the real property and equipment. The lease required Pinewood to provide fire and casualty insurance on the leased premises with Reff as the named insured and liability and dram shop insurance with Reff named as an additional insured. Pinewood worked with Woodward to obtain insurance on the premises from Auto-Owners through its agent, Bauer. At some point, Woodward advised Amy that Reff could not be identified as the "named insured" on the proposed policy because Pinewood would be the entity paying the premiums.

Smith lent Pinewood $100,000 to start its business evidenced by a promissory note. Smith's loan to Pinewood was unsecured. Prior to making the loan to Pinewood, Smith indicated to Pinewood's owners that she wanted to be secured in connection with her anticipated loan and raised the topic of insurance. Amy advised Smith that Amy had spoken with Woodward who had told Amy that Smith could be added to the insurance policy. Smith assumed that if she was identified in the insurance policy, in the event of a casualty, Reff would receive the fair market value of the building and then she would be paid the balance of her loan. Todd testified that approximately a week before the execution of the lease agreement with Reff, Todd had a discussion with Woodward. From this discussion, Todd understood Reff was to be the beneficiary of the building and personal property portion of the contemplated insurance policy.

An insurance binder, dated August 10, 2010, was issued by Bauer with an effective date of August 11, 2010 and expiration date of September 10, 2010 listing Pinewood as the insured. The binder bound coverage for property insurance (with coverage forms for "Building, Business Contents, Sign, Food Spoilage".) It also bound coverage for commercial general liability, excess liability, and workers' compensation and employer's liability coverages. Reff was listed on the binder and its interest was indicated by check marks being placed in 3 separate boxes one each labeled respectively "mortgagee", "loss payee", and "additional insured". An additional binder, dated August 10, 2010, was also issued by Bauer with an effective date of August 11, 2010 and expiration date of September 10, 2010 listing Pinewood as the insured. It was identical to the other binder except that Reff was not listed and, instead, Smith was listed as loss payee. An insurance application was made on behalf of Pinewood in which Pinewood is listed as the named insured, Smith as an additional interest of "loss payee" and Reff as an additional interest of "mortgagee". When the policy itself was issued by Auto-Owners, however, it did not list Reff as the named insured (as called for by the lease) or as mortgagee, loss payee and additional insured as provided in the binder. The policy listed Pinewood as the insured and listed only Smith in the section "secured interested parties and/or additional interested parties." Smith's interest is identified as "loss payable". The policy was for the period August 11, 2010 to August 11, 2011. Todd and Amy received a copy of this policy but did not read it.

2

A fire occurred on June 2, 2011. On June 3, 2011, Reff's owner (Peter Reff) and Pinewood's owners were told by Peter Salm, the insurance adjuster for Auto- Owners, that Reff was not named on the insurance policy as either the named insured or in any other capacity. Subsequently, on June 14, 2011, a change endorsement to the policy was made. The change is described on a policy declaration page as: "added the following mortgagee: Reff Properties." The declaration page notes "Change Endorsement Effective 08-11-2010." August 11, 2010 was the original effective date of the policy and the binders mentioned above. As set forth above, Reff did not hold a mortgage on the property. Reff owned the property and leased it to Pinewood. At no time after June 2, 2011 but prior to June 14, 2011 did anyone have any discussion with Smith about adding Reff to the insurance policy post-fire.

On November 29, 2011 Auto-Owners issued a check ("Building Check") in the sum of $439,252.33 payable to Pinewood, Reff, and Smith for the "actual cash value of building less deductible and mitigation." On that date, Auto-Owners also issued a check ("Contents Check") in the amount of $41,981.58 payable to Pinewood and Reff for the "actual cash value of contents less mitigation."[2]

In February 2012, the parties deposited these checks into Fishburn's trust account pursuant to an attorneys trust account agreement ("Trust Agreement") dated "February __, 2012." The Trust Agreement provides in relevant part that the Building Check is "to be disbursed as directed pursuant to a written agreement executed by Pinewood Buffet & Grill, Inc., Reff Properties, LLC and Jennifer Smith, or in lieu thereof, pursuant to court order." The Trust Agreement further provides that the "parties hereto agree that this Agreement is entered into for the purposes of facilitating receipt of said checks from the Insurance company pending resolution of current issues between the parties and said sum as held in said trust account shall have the same legal character for all purposes as when held by the insurance company subject to the terms of the relevant insurance policy."

No agreement was reached and eventually Pinewood filed a Chapter 7 bankruptcy petition on August 30, 2012. Reff, meanwhile, had sold the building and equipment on June 29, 2012 for $40,000. Plaintiff, as bankruptcy trustee, filed the present case as an adversary proceeding in the bankruptcy case. Reff filed counterclaims and the third-party action against the Insurance Defendants. This court, by order [12] entered April 9, 2014, granted Reff's motion to withdraw the reference of the adversary proceeding from the bankruptcy court.

Plaintiff claims the bankruptcy estate is entitled to the funds held under the Trust Agreement because the funds are proceeds of an insurance policy under which, at the time of the loss, Pinewood, not Reff, was the named insured. Reff claims it is entitled to the insurance proceeds because Pinewood was contractually obligated under the lease to provide insurance on the premises with Reff as the named insured and because, pursuant to the June 14, 2011 change endorsement, Reff was insured under the policy at the time of the loss. Bauer and Woodward support Reff arguing the insurance policy should be reformed to conform to the intent of the parties.

---

[2] Reff is only claiming $550.00 from the $41,981.58 check. It is undisputed the rest belongs to the bankruptcy estate as it was for Pinewood's contents damaged by the fire and not Reff's equipment that had been leased to Pinewood. Reff claims the $550.00 is for damage to a sign which Reff claims it owned. The $550.00 is the actual cash value of the loss to the sign as determined by the insurance adjuster.

3

The insurance policy issued by Auto-Owners, for purposes relevant here, included ISO Building and Personal Property Coverage Form CP 00 10 10 91 (Dkt. # 73-6, p. 71). That form provides in paragraph E. 4. c: "We will not pay you more than your financial interest in the Covered Property." (Dkt. # 73-6, p. 77). "You" means the named insured. Paragraph E. 4. d. provides: "We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property." (Dkt. # 73-6, p.77). The Loss Payable Provisions endorsement (Form CP 12 18 10 91) to the Building and Personal Property Coverage Form provides: "For covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an Insurable Interest, we will: 1. Adjust losses with you; and 2. Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear." (Dkt. # 73-6, p.85) The "Lender's Loss Payable" provisions of that endorsement provide: "For Covered Property in which both you and a Loss Payee have an Insurable Interest: a. We will pay for covered loss or damage to each Loss Payee in their order of precedence, as Interests may appear." (Dkt. # 73-6, p.86)

The commencement of a bankruptcy case creates an estate which includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S..C. § 541(a)(1). "Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d). "[S]tate law defines the 'property' that enters the bankruptcy estate, unless a provision of the Bankruptcy Code displaces state law." Peterson v. McGladrey & Pullen, LLP, 676 F.3d 594, 598 (7th Cir. 2012). It is the job of the court in a bankruptcy case, "to gather all of the debtor's assets, as state law defines those assets, and distribute them according to the creditors' rights under state law," absent some alteration by the bankruptcy code. Id.

As of the commencement of Pinewood's bankruptcy case, the Trust Agreement was in effect among Pinewood, Reff and Smith. Pinewood's bankruptcy estate, therefore, includes any interest Pinewood has under the Trust Agreement. The Trust Agreement expressly provides that the funds held under it "have the same legal character for all purposes as when held by the insurance company subject to the terms of the relevant insurance policy." The court looks first to Illinois law to determine the estate's interest in the insurance proceeds.

Under Illinois law, a "contract of insurance is established if one of the parties to such a contract proposes to be insured and the other party agrees to insure, and the subject, the amount, and the rate of insurance are ascertained or understood and the premium paid if demanded." Zannini v. Reliance Ins. Co., 590 N.E.2d 457, 464 (Ill. 1992) (internal quotation marks and citation omitted). An 'agent possessing power to bind the insurer has authority to bind it by a preliminary or temporary contract of insurance." Id. (internal quotation marks and citation omitted). There is no dispute that Bauer, acting through Woodward, had the authority to bind coverage for Auto-Owners. "An insurer can speak only through its representatives. The words of a representative who speaks to a potential insured are those of the insurer and the insurer is bound by the representative's words." Id., at 465. "Where an agent is authorized to act, and through his mistake or fraud, the policy fails to express the real contract between the parties, or, if by inadvertence, negligence or mistake of the agent, provisions other than those intended are inserted, or stipulated provisions are omitted, there is no doubt as to the power of the court of equity to grant relief by reformation of the contract." Id. (internal quotation marks and citation omitted).

4

There is no dispute that Pinewood intended that Reff would be covered by the insurance policy it obtained. The lease clearly obligated Pinewood to provide such insurance. Pinewood's owners acted to provide insurance covering Reff and believed they had done so. Bauer provided an insurance binder, executed by Woodward, binding Auto-Owners to insure not only Pinewood but also including Reff as mortgagee, loss payee, and additional insured. When the policy was issued it did not include Reff in any of these capacities. This omission was clearly an error and contrary to the intent of Pinewood and the insurer as evidenced by the binder.

The "Loss Payable Provisions" endorsement (Dkt. # 73-6, p.85) to the "Building and Personal Property Coverage Form" of the policy actually issued provides: "For covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an Insurable Interest, we will: 1. Adjust losses with you; and 2. Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear." Reff, as the owner of the real estate, clearly had an insurable interest in the property. Had the loss occurred after the binder was issued but before the policy was issued Reff obviously would have been entitled to payment as loss payee as its interest appeared. There is no evidence anyone intended the issued policy to vary from the binder. All of the undisputed evidence on summary judgment shows Reff's omission was a mistake of the agent or the insurer, not an intentional decision on the part of any of the individuals or entities involved.

Plaintiff argues the insurance policy as issued clearly does not provide coverage for Reff. Plaintiff contends that since the binder was, by its own terms, canceled when it was replaced by the policy, Reff was not covered by the insurance once the policy was issued. Plaintiff relies on the well-settled rule that in interpreting an insurance policy (or any contract) the clear and unambiguous terms of the policy control. See Pekin Ins. Co. v. Precision Dose, Inc., 968 N.E.2d 664, 673 (Ill. App. 2012). Nowhere in the policy does language appear saying Reff is insured. The binder's language unambiguously states the binder was canceled when the policy was issued. The fire occurred after the policy was issued so, according to plaintiff, under the plain language of the binder and the policy, Reff was no longer insured at the time of the loss.

The plain language of the policy also says "[w]e will not pay you ["you" being the named insured] more than your financial interest in the Covered Property." (Dkt. # 73-6, p. 77). Plaintiff has presented no evidence to support a claim Pinewood had a financial interest in the Covered Property worth the $439,252.33 paid by the insurer. The insurance adjuster's claim report (Dkt. # 73-5, pp. 102-140) indicates a replacement cash value ("RCV") of $724,101.41 less depreciation of $282,092.18 for an actual cash value ("ACV") of the loss under the commercial property coverage as $442,009.23. (Under the terms of the policy the Covered Property is valued at "actual cash value at the time of the loss."[3] (Dkt. # 73-6, p.78).) The adjuster's claim report gives a detailed breakdown of the RCV and ACV of each item calculated in estimating the loss. The total ACV for the exterior of the building is $80,287.79 and the total for the main level of the building is $360,647.38, which totals $440,935.17. These items all relate to the building. There is no dispute Reff not Pinewood owned the building. The lease required Pinewood to maintain insurance "insuring the leased Premises against any damage by fire or other

---

[3] The policy provides for an optional replacement cost coverage. (Dkt. # 73-6, p.60) Under that optional coverage, "Replacement Cost; (without deduction for depreciation) replaces Actual Cash Value" in determining the amount of the loss. (Dkt. # 73-6, p.82). However, the difference between ACV and RCV would not be paid under the policy until the "lost or damaged property is actually repaired or replaced." (Dkt. # 73-6, p.82). The property here was not actually repaired or replaced so ACV not RCV is the proper valuation on these facts.

5

casualty to its full insurable value" naming Reff the named insured on the policy.  This lease language is a strong indication that the financial interest in the building was Reff's.  The evidence available on summary judgment does not show Pinewood had a financial interest in the Covered Property to support a claim that the insurance proceeds for the loss to the building were properly payable to it.

Reff also contends the policy was reformed by the June 14, 2011 change endorsement naming Reff as a covered mortgagee as of August 11, 2010, the date the binder was issued.  Plaintiff argues the change endorsement was ineffective because the policy could not be reformed after the loss, the change incorrectly identified Reff as a mortgagee (not as a lessor) and because Smith did not consent to the change.

Smith's lack of consent is not a basis for finding the change endorsement ineffective.  While the binder which included Smith designated her as a loss payee, and the policy that was issued listed Smith's interest as "loss payable", the evidence before the court here on summary judgment fails to show Smith had an insurable interest in the property.  The leased premises was owned by Reff and leased to Pinewood.  Smith had no security interest in any property, real or personal, of Pinewood's or Reff's.  While Todd and Amy and Pinewood were obligated to Smith on a promissory note, this debt was not secured by any collateral.  The policy's "Loss Payable Provisions" endorsement provides that where both the insured (Pinewood) and a loss payee have an insurable interest in covered property, the insurer will pay any claim for loss jointly to Pinewood and the loss payee as interests may appear.  Without an insurable interest in the property, Smith, a general unsecured creditor, was not entitled under the policy to any payment for any damage to the property.  Third Establishment, Inc. v. 1931 North Park Apartments, 417 N.E.2d 167, 172 (Ill. App. 1981) (a general creditor has no claim on insurance proceeds); see generally, 44 Am. Jur. 2d Insurance § 964 (Database Updated May 2015) ("creditor without a lien either statutory or contract and owning a mere personal claim against the debtor, does not have an insurable interest in the property of the debtor.")  Smith's consent to the June 14, 2011 change endorsement was not required because Smith had no cognizable interest under the policy.

Reff, on the other hand, did have an insurable interest in the property as the owner/lessor.  Reff was designated in the binder as a mortgagee, loss payee, and additional insured.  Reff was designated in the application as a mortgagee and also in the June 14, 2011 change endorsement.  The "Loss Payable Provisions" endorsement to the policy contains "Lender's Loss Payable" provisions.  The "Lender's Loss Payable" provisions apply where the designated loss payee is "a creditor, including a mortgageholder or trustee whose interest in the Covered Property is established by such written instruments as . . . [m]ortgages, deeds of trust, or security agreements." (Dkt # 73-6, p. 86)  The "Lender's Loss Payable" provisions convey more rights on a creditor loss payee than on a non-creditor loss payee – particularly by granting a creditor loss payee the right to receive payment for a loss even under circumstances where the named insured's claim would have been denied due to the named insured's failure to comply with certain terms of the policy.  While a lease is not specifically identified in the list of "such written instruments as," Reff was a creditor of Pinewood under the lease, the leased property was Covered Property under the policy, and Reff owned the Covered Property.  In light of these facts, the use of the term "mortgagee" in the change endorsement is consistent with an intent to correct the policy to conform it to the binder by naming Reff a loss payee under the "Loss Payable Provisions" endorsement.

Nothing precludes the insurer from acting voluntarily to conform the policy to the agreement of the parties as evidenced in the binder even after the loss.  At the time of the change, no other party's interests were adversely affected because only Pinewood, Reff, and the insurer had any actual interest in

6

the insurance contract. Plaintiff cites the Third Establishment case referenced above for the proposition that Reff could not be added as a new insured post-fire because the interest and right of the insured are fixed as of the date of the loss. However, Third Establishment does not so hold. Third Establishment involved a claim by a building owner/lessor on the proceeds of insurance paid for damage to trade fixtures and building contents which were not owned by the lessor. The lessee owned the contents. The lease required the lessee to carry insurance on "furniture and fixtures" but did not require that the lessor be named as an insured or loss payee on this insurance, nor provide that the proceeds should be paid to lessor. The court stated "the contents did not belong to the lessor. If they were destroyed the lessor would suffer no loss from the destruction." Id. The court noted that since the amount of rent payable to lessor was determined in part by the amount of lessee's gross sales "it was a matter of concern to the lessor that the lessee, in the event of fire, be able to resume business promptly." Id. So, the lessor had an interest in requiring the lessee to carry insurance on the contents to provide lessee the necessary funds to replace the contents and resume business but that was distinct from having an insurable interest in the contents themselves. The Third Establishment lessor had no insurable interest in the property. While the lessee who did have such an interest could have assigned the insurance proceeds to the lessor, it did not do so and the court declined to construe the lease as requiring such an assignment. Id. Third Establishment does not hold that an insurer and its insured cannot agree to reform an insurance policy after a loss to correct a mistake.

Plaintiff maintains section 544(a) of the bankruptcy code entitles the estate to the funds held under the Trust Agreement and prevents reformation of the policy because such reformation would impair the trustee's avoiding powers under section 544. Section 544(a) provides that a bankruptcy trustee shall have, as of the commencement of the bankruptcy case, "the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by – (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against debtor that is returned unsatisfied at such time, whether or not such a creditor exists." As of the commencement of Pinewood's bankruptcy case, therefore, plaintiff obtained the rights and powers that would have been possessed by these hypothetical creditors of Pinewood as of the commencement date. Thus, besides whatever interest in the funds held under the Trust Agreement the estate obtained under section 541, the trustee may also assert whatever rights a hypothetical section 544(a)(1) or (2) creditor of Pinewood would have in those funds.

Under Illinois law, there are a number of ways a "judicial lien" can be created on a judgment debtor's interest in property. Delivering a certified copy of a judgment to the sheriff for service on the debtor creates an execution lien on debtor's interest in goods and chattels. 735 ILCS 5/12-111. Serving a non-wage garnishment (735 ILCS 5/12-707(a)) or citation to discover assets (735 ILCS 5/2-1402(m)) creates a lien on nonexempt property of the judgment debtor held by the garnishee ("indebtedness or other property") or party served with the citation ("personal property, including money, choses in action, and effects"). So, for example, a hypothetical creditor serving a citation to discover assets or a non-wage garnishment on Fishburn as of the commencement of Pinewood's bankruptcy case would have obtained a lien on Pinewood's interest in the funds held under the Trust Agreement. Fishburn would have been precluded from transferring Pinewood's interest in the funds. Where, as here, another party claims an interest in the funds, the rights of the adverse claimant must be determined by the court in an adverse

7

claims trial before any of the funds may be turned over to the judgment creditor/ judicial lienholder. 735 ILCS 5/2-1402(g); 735 ILCS 5/12-710.

Since the trustee obtained hypothetical lien creditor status as of the filing of the bankruptcy case, more than a year after the voluntary reformation by the insurer effected by the June 14, 2011 change endorsement, Reff already had an interest in the funds prior to the bankruptcy filing. A section 544 hypothetical lien creditor's lien would not extend to Reff's interest in the property. Plaintiff's avoiding powers under section 544, therefore, were not impaired by the June 14, 2011 change endorsement.

Even if the June 14, 2011 change endorsement were found not to be effective, Bauer and Woodward argue reformation of the policy by the court to conform it to the intent of the parties is appropriate now. As noted above, the evidence shows everyone involved in the transaction (Pinewood's owners, Woodward, Reff, and Smith ) agrees Reff was intended to be a covered loss payee under the policy. In Zannini, quoted above, Zannini contacted Nesslar, an agent for Reliance, to obtain renter's insurance including coverage for jewelry in an amount up to $25,000. Nesslar orally bound coverage for Zannini with Reliance. Zannini received a written policy from Reliance but stated "he probably did not read it and did not notice any discrepancy in coverage between the written policy and the coverage Nesslar said he would obtain." Zannini, 590 N.E.2d at 459. Zannini suffered a loss of jewelry, apparently by theft, and made a claim under the policy. However, the policy Zannini received from Reliance provided a $500 limit for loss of jewelry. After Zannini made the claim, Nesslar realized he had not given Reliance the schedule of jewelry. He advised Reliance that he had bound coverage for the jewelry but had failed to give Reliance the schedule of jewelry. Reliance denied coverage based on Nesslar's failure to notify Reliance within seven days of binding coverage as required by the agency agreement between Nesslar and Reliance. It was undisputed that Zannini and Nesslar intended that the policy would include coverage for scheduled jewelry up to $25,000 and that "Nesslar agreed to and purported to bind such coverage." Id., at 460. On these facts, the court held that a contract for insurance was formed between Reliance and Zannini based on the oral binder by Nesslar and that the contract included coverage for the jewelry. Id., at 465. The court reformed the insurance policy to conform it to the contract the parties actually entered.

The factual situation here is analogous to the factual situation in Zannini. Bauer through Woodward bound coverage which included Reff as a loss payee. The policy failed to match the coverage that had been bound. The insured received the policy but failed to read it. A loss occurred and the error in coverage was discovered when the policy was examined in connection with the making of a claim under the policy. Applying Zannini to these facts, the policy would be reformed to show Reff as a loss payee under the policy at the time of the loss as it was clearly the intent of the parties to the contract at the time it was formed to make Reff a loss payee.[4] As a loss payee under the policy at the time of the loss, under Illinois law, Reff would be entitled to payment of its claim as its interest appeared at that time. This interest of Reff's, therefore, would attach to the funds held under the Trust Agreement as well. Pinewood's interest in the funds held under the Trust Agreement would include only those funds that were not payable to Reff as loss payee under the insurance contract.

---

[4] As noted above, Smith does not claim she is entitled to any of the insurance proceeds though she was named a loss payee in one of the insurance binders and had her interest identified in the policy as "loss payable". As discussed above, Smith was an unsecured creditor of Pinewood and lacked an insurable interest in the subject property. Without an insurable interest, Smith was not eligible to receive payment as a loss payee under the terms of the policy. Dkt. # 73-6, p.85.

8

Does section 544 prevent the court from making this reformation to the policy? A hypothetical lien creditor would have a lien on Pinewood's property as of the commencement of the bankruptcy case. At that point, Pinewood owned whatever interest it possessed under the Trust Agreement. The Trust Agreement provides that the funds held have "the same legal character for all purposes as when held by the insurance company subject to the terms of the relevant insurance policy." The policy provides the insurer will not pay the insured more than the insured's financial interest in the covered property. As set out above, the evidence on summary judgment does not show Pinewood had a financial interest in the property and, therefore, in the funds to the extent of the $439,252.33 Building Check transferred into the trust. The adjuster's claim report showed an ACV for the damage to the building of $440,935.17. Reff owned the building. A lien creditor filing a garnishment or serving a citation to discover assets on Fishburn as trustee would have a lien only on Pinewood's interest in the funds and the determination of that interest would be subject to an adverse claim trial in which Reff could prove its claim to the funds and obtain a judgment awarding it its interest. 735 ILCS 5/12-710(b);735 ILCS 5/2-1402(g). Nothing in Illinois law appears to bar an adverse claimant from establishing its claim to property via proving its right to reformation of a contract.

Plaintiff cites a number of cases involving errors in recorded mortgages which he argues show Section 544 bars reformation of the policy after the commencement of a bankruptcy case. In re Lawson, Adv. No. 10-1330, 2011 WL 1167115 (Bankr. E.D. Tenn. Mar. 28, 2011); In re Easter, 367 B.R. 608 (Bankr. S.D. Ohio 2007); In re White Beauty View, Inc., 81 B.R.290 (Bankr. M.D. Penn. 1988); In re Berg, 387 B.R. 524 (Bankr. N.D. Ill. 2008); Wolters v. Flagstar Bank FSB, 429 B.R. 587 (Bankr. W.D. Mich. 2010). However, the rights and priorities of lienholders and bona fide purchasers in real estate are determined under real estate recording law and have no application here. Section 544(a)(3) grants a bankruptcy trustee the rights and powers of a bona fide purchaser of real estate from the debtor "that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists." The trustee also has the rights and powers of a hypothetical lien creditor in real estate conferred by Section 544(a)(1) and (2) set out above. As a general principle, under Illinois law, a bona fide purchaser of real estate from the debtor (see In re Crane, 742 F.3d 702, 706 (7th Cir. 2013) (applying Illinois law)) or a judgment lien creditor who records a memorandum of judgment (735 ILCS 5/12-101) will have priority over an unrecorded mortgage (or other interest) or a recorded mortgage that is defective in such a way that it would fail to give notice to someone searching the real estate records that it was an encumbrance on the debtor's real estate. Pursuant to Section 544(a), the bankruptcy trustee is put into the same position as such a bona fide purchaser or judgment lien creditor.

However, there is no system requiring a public recording or filing of a document to give notice to the world of an interest as a loss payee under an insurance contract and, thus, perfect that interest against subsequent purchasers or creditors. As discussed above, a judgment creditor's lien only attaches to the interest the judgment debtor has in the insurance contract at the time the judgment lien is created. A reformation would not effect a transfer from Pinewood to Reff but only conform the policy issued to the insurance contract entered. Reff possessed its interest as loss payee all along and Pinewood never possessed that interest. Accordingly, Section 544 does not prevent reformation by the court as no judgment lien possessed by a creditor of Pinewood would have attached to Reff's interest in the insurance proceeds. Therefore, even if the June 14, 2011 change endorsement had not effectively reformed the policy to make Reff a loss payee, the court would reform it now to do so, as that was clearly the intent of the parties when they formed the insurance contract as evidenced by the binder.

9

Reff also argues that if the estate has any interest in the funds, that interest is subject to a constructive trust or equitable lien in favor of Reff. However, as discussed above, the estate did not obtain an interest in the funds held by Fishburn to the extent those funds are in payment for damage to the building owned by Reff. Therefore, neither a constructive trust nor equitable lien is appropriate or necessary to establish Reff's interest in the funds.

Plaintiff argues that even if Reff is found to have an interest in the funds, that interest is no more than $144,800, which is the fair market value of the property ($184,800 based on the tax assessor's assessment for the 2011 tax year) less the $40,000 Reff received when it sold the property. Plaintiff notes that the policy provides: "We will not pay the owners more than their financial interest in the Covered Property." (Dkt. # 73-6, p.77).

Under the terms of the policy the Covered Property is valued at "actual cash value at the time of the loss." (Dkt. # 73-6, p.78). ACV, as discussed above, is the RCV minus depreciation. The amount of the Building Check tendered by the insurer is slightly less than the ACV of $440,935.17 for the damage to the exterior and main level of Reff's building as estimated in the adjuster's claim report. Auto-Owners payment is consistent with its contractual obligation to pay ACV for the damage to Reff's building. Auto-Owners has not claimed it was obligated to pay only some lesser amount. Illinois courts have rejected approaches for determining actual cash value other than the replacement cost less depreciation method. Carey v. American Family Brokerage, Inc., 909 N.E.2d 255, 263 (Ill. App. 2009). The "proper calculation of actual cash value under both Illinois law and the policy in the case at bar is 'replacement cost less depreciation.'" Id.

Plaintiff appears to be advocating what has been characterized as the "broad evidence" test to determine actual cash value. "Under the 'broad evidence' test, consideration is given to every fact and circumstance logically tending to establish the true economic value of damaged property, such as its original cost; its obsolescence, both structural and functional; depreciation and deterioration to which it has been subject; and the opinion of value given by qualified expert valuation witnesses." Id., at 263. The evidence plaintiff argues should be considered is the tax assessor's valuation and the price Reff sold the property for a year after the fire. Plaintiff also references the portion of the purchase price allocated to the building ($225,000) when Reff purchased the building and equipment. However, the "broad evidence" test has been expressly rejected by Illinois courts. Id. Replacement cost less depreciation is the applicable method for calculating actual cash value.

Chicago Title & Trust Co. v. United States Fidelity & Guaranty Co., 511 F.2d 241 (7th Cir. 1975), cited by plaintiff, does not require a different result. In Chicago Title, the court recognized that in Illinois, the replacement cost less depreciation method of determining actual cash value appears to be "limited by the policy of the law that requires an insurable interest as a condition to recovery on a contract of insurance. If, at the time of the fire, the building no longer has any economic value, there can be no insurable interest and therefore no recovery of damages." Chicago Title, 511 F.2d at 246. In Chicago Title, the building was vacant, had already previously been damaged by fire and not repaired before a second fire on which the claim was being made occurred, and had been subject to a state court demolition suit for 21 months in which the state court had ordered the property to be boarded up and secured. Here, the building clearly had economic value to Reff. It (along with certain equipment) was leased to a tenant paying rent at the rate of $57,600 per year. It housed an operating restaurant at the time of the fire. There is no evidence indicating the building lacked economic value at the time of the fire.

For the foregoing reasons, plaintiff's motion [66] for summary judgment is granted in part and denied in part. Plaintiff's motion is granted as to the sum of $41,431.58 from the proceeds of the "Contents Check". Otherwise, plaintiff's motion is denied. Reff's motion [70] for summary judgment is granted. Fishburn is ordered to deliver the sum of $41,431.58 from the proceeds of the "Contents Check" to plaintiff. Fishburn is directed to deliver the proceeds from the "Building Check" and $550.00 from the proceeds of the "Contents Check" to Reff Properties, LLC. It appears that this order moots Reff's third-party action against the Insurance Defendants and Smith. Reff shall file a motion to dismiss the third-party action or notify the court that it intends to proceed with that action – with an explanation as to why the action is not moot – on or before August 21, 2015.

Date: 7/22/2015 ENTER:

*Philip G. Reinhard*
United States District Court Judge

Notices mailed by Judicial Staff. (LC)